# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

JASON MANN,

                **Plaintiff,**

vs.

JUSTIN GIBBS, TRAVIS FRED,
DARLENE BLUDWORTH, GALE
GLADSON, and JACKSON COUNTY

                **Defendants.**

)
)
)
)
)
)
)
)
)
)

Case No. 14-cv-421-SCW

## MEMORANDUM AND ORDER

**WILLIAMS, Magistrate Judge:**

### INTRODUCTION

Plaintiff Jason Mann brought the present lawsuit pursuant to 42 U.S.C. § 1983, alleging violations of his civil rights. Plaintiff Mann alleges that while he was a detainee at the Jackson County Jail, he was attacked by another inmate and did not receive adequate medical treatment. This matter is before the Court on Motions for Summary Judgment filed by Defendants Gibbs, Fred, Bludworth, and Gladson. (Docs. 115, 125) and a Motion to Dismiss filed by Jackson County, Illinois. (Doc. 118). Previously, Defendant Thomas Kupferer was voluntarily dismissed by Plaintiff. (Docs. 127, 129). Therefore, the Motion for Summary Judgment that was filed by Defendant Kupferer (Doc. 114) is **MOOT**.

Responses to the remaining motions have been filed, and they are ripe for disposition. For the reasons stated below, the Motion for Summary Judgment filed by

1

by Defendants Fred, Gibbs, and Bludworth (Doc. 125) is **GRANTED in part and DENIED in part**, the Motion for Summary Judgment filed by Defendant Gladson (Doc. 115) is **DENIED**, and Defendant Jackson County, Illinois' Motion to Dismiss is **GRANTED**.

**FACTUAL AND PROCEDURAL BACKGROUND**

On January 23, 2013, Jason Mann was a pretrial detainee being held at the Jackson County Jail ("the Jail") and was housed in the C Dormitory ("C Dorm"). (Doc. 128-5, p. 12). C Dorm can house 12 people (Doc. 128-6, p. 7); however, on January 23, 2013 there were 19 inmates in C Dorm. (Doc. 128-7). Since there were only enough beds for 12 people, Plaintiff Mann had to sleep on a mat on the floor. (Doc. 128-5, p. 13). Plaintiff, slept a couple of feet away from an inmate named Jason White. (*Id.*). On January 23, a group of inmates, led by White, attacked Plaintiff. (*Id.* at 15). Due to the attack, Plaintiff suffered an injured nose, bruises to his ribs and torso, contusions on his abdomen, an injury to his ankle, and stab wounds. (*Id.* at 27). Plaintiff was left with two parallel scars on his torso as a result of the stab wounds. (*Id.*).

Plaintiff's mother and brother saw Plaintiff after the attack on the same day, January 23, 2013. (Doc. 128-9, 128-10). Shortly after the attack, Plaintiff was escorted to the visitation area by Defendant Travis Fred. (Doc. 128-5, p. 19). Defendant Fred asked Plaintiff what happened, to which Plaintiff responded "What does it look like?" (*Id.* at 20). Defendant Fred responded by saying "It looks like you got your ass beat." (*Id.*). Once Plaintiff got to the visitation area, both his mother and his brother noted that Plaintiff had lacerations on his face and head and that his lip was bleeding. (Doc. 128-9,

128-10).   After the visit, Plaintiff was taken to the booking area and was asked to identify his assailants.   (Doc. 128-5, p. 20).   He was placed in a holding cell, and Defendants Fred and Gibbs then arrived and told Plaintiff that White and his cohorts indicated that Plaintiff owed them something.   (*Id.*).   While Plaintiff was in the holding cell, his ankle swelled to the size of a baseball.   (*Id.* at 35).   Eventually, Plaintiff was taken to B Dorm.   (*Id.* at 20).   Later that evening, while medication was being brought around in B Dorm, Plaintiff asked for, and was given, two Band-Aids.   (*Id.*).

Plaintiff filled out medical request forms and grievances every day from January 23, 2013 through the end of February 2013.   (*Id.* at 39).   In his medical requests, Plaintiff sought treatment for the injuries he sustained in the attack.   (*Id.* at 22).   Another detainee, Thomas Bible, claims that he witnessed Plaintiff writing daily grievances. (Doc. 128-11, p. 3).   Plaintiff was not provided with a copy of his medical requests or grievances.   (Doc. 128-5, p. 21).   Medical requests are picked up by jail officers, (Doc. 115-1, p. 4), and according to Nurse Gladson, are reviewed by nursing staff at least twice a day, (Doc. 115-2, p. 2).   Plaintiff admitted that he does not personally know whether Nurse Gladson saw the medical requests he claims he submitted.   (Doc. 115-1, p. 4).   Plaintiff sent a Freedom of Information Act request asking for medical records in this matter.   (Doc. 128-5, p. 29).   He did not receive any medical requests prior to February 25, 2013, however.   (*Id.*)

Plaintiff began receiving Benadryl around the 24th or 25th of January 2013.   (*Id.* at 32).   On February 14, 2013, Plaintiff drafted a grievance requesting that the Benadryl be discontinued.   (Doc.  126-7).   In this grievance, Plaintiff wrote: "I do appreciate the

gesture by the nurse, but Benadryl does very little for a broken nose. An ice pack would have seemed more helpful." (*Id*.). Nurse Gladson testified that she reviewed the part of the grievance only relating to Plaintiff not wanting any more Benadryl. (Doc. 126-1, p. 3, 4). She testified that she was not aware of Plaintiff suffering a broken nose, and she did not examine Plaintiff prior to discontinuing the Benadryl. (*Id*. at 3).

At some point in February 2013, Plaintiff suffered from severe stomach pains. Doc. 126-2, p. 14). He put in a medical request, but had to wait two days before he was called to see the nurses. (*Id*.). By that time, however, he claims he was no longer experiencing the pain and decided not to see the nurse. (*Id*.).

Plaintiff's stab wounds eventually healed, but they were not examined until he was transferred to Menard Correctional Center ("Menard"). (*Id*. at 15). These wounds left two parallel scars on his torso. (*Id*. at 16, 17). Mann still has issues with his nose, balance, and pain. (*Id*. at 141 – 42). Plaintiff was transferred out of the Jail into IDOC custody on August 14, 2013. (Doc. 128-5, p. 5).

Prior to the attack, Plaintiff did not have any problems or conflicts with Inmate White. (Doc. 125-1, p. 12). He did not make any complaints to Defendants Bludworth, Gibbs, or Fred during his time in C-Dorm before the January 23rd attack. (*Id*.). Plaintiff admitted that, immediately prior to the attack, he was unaware of any reason to believe that he would be attacked in the manner he was. (*Id*. at 17). Prior to the January 23, 2013 attack, however, on April 5, 2012, Inmate White was charged with a disciplinary violation wherein it is alleged he attacked another inmate, Rawlins, by "strik[ing] him repeatedly about the face and body." (Doc. 128-15, p. 2). The report was completed by

Deputy Tellor. (*Id.*). On April 9, 2012, Corporal John Huffman held a Disciplinary Hearing and reviewed the video of the April 5th incident. (Doc. 128-16, p. 2). Corporal Huffman concluded that White was the aggressor in the altercation and attacked Rawlins, attempted to pull Rawlins up the stairwell out of sight of the windows. (*Id.* at 2 – 3). The report was signed by Defendant Bludworth as shift supervisor. (*Id.* at 2).

On August 15, 2012, an incident form was completed by a Corporal Smith. (Doc. 128-17, p. 2). Corporal Smith wrote that sources revealed to him "inmates in G block bullying and stealing commissary from other inmates." (*Id.*). According to the corporal, there had been a fight the previous week involving Inmate White, and that White was responsible for the bullying and stealing. (*Id.*). As a result, White was transferred to K block to prevent him from bullying other inmates. (*Id.*).

As Plaintiff was attacked in C Dorm, at some point prior to January 23, 2013, Inmate White was transferred to C Dorm. K block, where White was placed in August 2012, holds a total of six inmates. (Doc. 128-6, p. 8). An aggressive inmate can be placed in J or K blocks. (Doc. 128-4, p. 15, 18, 19). J block is a maximum security block with only three cells, thereby allowing the maximum number of inmates in the block to be six. (*Id.* at 18).

On April 4, 2014, Plaintiff filed the instant lawsuit, naming as defendants, Gibbs, Fred, Bludworth, Gladson, and Kupferer.[1] (Doc. 1). Plaintiff successfully pleaded two counts against Defendants: Count 2 for failing to protect Plaintiff from an excessive risk of attack, and Count 4 for deliberate indifference to Plaintiff's serious medical needs.

---

[1] Other defendants were dismissed by Judge Reagan during his threshold review. (*See* Doc. 6, p. 13).

(Doc. 6, p. 5).  On September 9, 2016, Plaintiff filed an Amended Complaint, adding Jackson County, Illinois ("Jackson County") as a defendant.  (Doc. 110).  He alleges that Jackson County was the source of unconstitutional policies and/or practices that led to his injuries and lack of medical treatment.  (Doc. 110, p. 13 - 16).

MOTION TO DISMISS

1. **Legal Standard**

Defendant Jackson County moves for dismissal on statute of limitations grounds. It argues that by the time it was brought into this suit, the limitations period had already passed, and that the amended complaint naming Jackson County as a defendant does not relate back to Plaintiff's original complaint within the limitations period.[2]  Though Defendant Jackson County has titled its motion a Motion to Dismiss, the Court notes that the Seventh Circuit has expressed a preference for construing motions based on the statute of limitations as brought pursuant to Federal Rule of Civil Procedure 12(c), Judgment on the Pleadings.  *See e.g. Frey v. Bank One*, **91 F.3d 45 (7th Cir. 1996).**  Practically, however, there is no difference between a motion to dismiss brought under Rule 2(b)(6) and a motion for judgment on the pleadings under Rule 12(c).  *Brooks v. Ross*, **578 F.3d 574, 579 (7th Cir. 2009)**.  The standards for a 12(b)(6) motion and 12(c) motions are identical.  *Hayes v. City of Chi.*, **670 F.3d 810, 813 (7th Cir. 2012)**.

Claims brought pursuant to § 1983 borrow the statute of limitations from the

_____

[2] The Court notes, as raised by Plaintiff, that Jackson County filed its Motion to Dismiss as responsive pleading out of time without seeking leave.  (*See* Docs. 110, 118).  The statute of limitations issue could still have been raised by Jackson County as part of a motion for summary judgment, however, and the Court finds that Plaintiff is not prejudiced by the tardy filing.

state in which the alleged violation occurred. *Wilson v. Garcia*, **471 U.S. 261, 276 (1985);**

*Ashafa v. City of Chicago*, **146 F.3d 459, 461 (7th Cir. 1998).** Illinois has a two year

statute of limitations, which thus becomes the applicable statute of limitations for § 1983

claims arising in Illinois. *Kalimara v. Illinois Dep't of Corrections*, **879 F.2d 276, 277**

**(7th Cir. 1989).** Additionally, the Federal Courts also borrow the forum state's

principles of tolling. *Smith v. City of Chicago Heights,* **951 F.2d 834, 839-40 (7th Cir.**

**1992).** Illinois requires tolling by statute where "the commencement of an action is

stayed by an injunction, order of the court, or statutory prohibition." **735 ILCS 5/13-216.**

While the Seventh Circuit has found that federal courts must toll the statute of

limitations period while an inmate exhausts his administrative remedies as required by

the Prisoner Litigation Reform Act ("PLRA"), *Johnson v. Rivera*, **272 F.3d 519, 522 (7th**

**Cir. 2001)**, Plaintiff has not raised the issue of tolling in his response, and the Court

therefore need not concern itself with the issue.

The key issue here is whether Plaintiff's Amended Complaint filed on September

9, 2016 relates back to his original complaint filed on April 9, 2014. Relation back is

governed by Federal Rule of Civil Procedure 15. The rule provides that an amended

pleading relates back to the original pleading when

> (A)   the law provides the applicable statute of limitations allows
>        relation back;
>
> (B)   the amendment asserts a claim or defense that arose out of the
>        conduct, transaction, or occurrence set out—or attempted to be set
>        out—in the original pleading; or
>
> (C)   the amendment changes the  party or the naming of the party
>        against whom a claim is asserted, if Rule 15(c)(1)(B) is satisfied and

if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment:

(i)   received such notice of the action that it will not be prejudiced in defending on the merits; and

(ii)  knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.

FED.R.CIV.P. 15(c).

### 2. Analysis

Because Plaintiff did not make a "mistake concerning the proper party's identity" under Rule 15(c) in not naming Jackson County as a defendant in his original complaint, the Amended Complaint adding Jackson County does not relate back. The provisions of Rule 15(c) at issue here are (c)(1)(A) regarding relation back if the applicable statute of limitations allows it, and (c)(1)(C) regarding an amendment that changes a party. Illinois law allows relation back under **735 ILCS 5/2-616(d)**; however, Illinois' rule is "functionally identical" to the federal rule governing relation back. *Schorsch v. Hewlett-Packard Co.*, **417 F.3d 748, 751 (7th Cir. 2005)**. Under both rules, in order for an amended complaint adding a newly named defendant to relate back to the original complaint, within a certain time period, the newly named defendant must have known or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against it. *See* **735 ILCS 5/2-616(d); FED.R.CIV.P. 15(c)(1)(C)**.

The addition of Jackson County as a defendant in the Amended Complaint is not the result of Plaintiff's mistake concerning the identity of the proper party.

Plaintiff's claims against Jackson County are for unconstitutional policies and/or procedures brought pursuant to ***Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658 (1978)**.[3] Rather than misidentifying a defendant, it is apparent that Plaintiff simply failed to bring, or even attempt to bring, a *Monell* claim in his original complaint. The original complaint contains no allegations regarding policies and procedures being the source of any of Plaintiff's injuries, and there was no *Monell* claim against any of the defendants found by Judge Reagan in his merits review order. Rather, the allegations in the original complaint are against individuals regarding their personal conduct.

The situation at bar differs from other cases where courts found relation back was appropriate. In ***Krupski v. Costa Crociere*,** the Plaintiff, Wanda Krupski was injured while on board a cruise ship. **560 U.S. 538, 541 (2010)**. She brought suit against a company called Costa Cruise, alleging that it was the owner of the ship. ***Id.* at 543**. Costa Cruise, however, repeatedly informed Ms. Krupski that it was merely a sales and marketing agent for Costa Crociere, who was actual vessel owner. ***Id.*** Eventually, Costa Cruise was voluntarily dismissed from the suit, and an amended complaint adding Costa Crociere as a defendant was filed. ***Id.* at 544**. Represented by the same counsel who represented Costa Cruise, Costa Crociere moved to dismiss Ms. Krupski's suit, arguing that the statute of limitations had run and that the amended complaint did not relate back. ***Id.* at 544 – 45**. While the district court and court of appeals found

---

[3] In *Monell*, the Supreme Court held that municipalities could be liable for unconstitutional policies and customs under § 1983. ***Monell*, 436 U.S. at 694**.

that dismissal was proper, the Supreme Court reversed.  The Court clarified that when deciding whether an amended complaint relates back under Rule 15(c)(1)(C)(ii), the deciding court should examine the defendant's point of view, and determine whether the defendant, rather than the plaintiff, "knew or should have known that it would have been named as a defendant but for an error." *Id.* **at 548**.  Using this standard, the Court found that since it was clear from the complaint that Ms. Krupski intended to sue the company that owned and controlled the ship on which she was injured, Costa Crociere should have known, within the proper time period, that it was not named as a defendant solely due to Krupski's "misunderstanding about which 'Costa' entity was in charge of the ship." *Id.* **at 554 – 55**.

A similar situation was presented to the Seventh Circuit in ***Joseph v. Elan Motorsports Technologies Racing Corp.*, 638 F.3d 555 (7th Cir. 2011)**.  There, Timothy Wardrop brought suit against Elan Motorsports Technologies Racing Corp. ("Elan Corp.") for breach of a written employment contract.  ***Elan*, 638 F.3d at 557**.  The written contract stated that the parties to the agreement were Waldrop and Elan Motorsports Technologies, Inc. ("Elan, Inc.").  *Id.*  Though they were affiliated and managed out of the same office, Elan Corp. and Elan Inc. were separate entities.  *Id.* **at 557, 560**.  Waldrop was later succeeded by a trustee in bankruptcy, and upon finding the error, the trustee sought to amend the complaint to change the defendant to Elan Inc.  *Id.* **at 557**.  The trustee sought relation back to the original complaint since the statute of limitations had run.  *Id.*  The Seventh Circuit found that relation back was appropriate.  The individual who received the complaint oversaw Waldrop's services

under his contract with Elan Inc., and the court found that he had to know that Elan Inc. was the intended defendant but for Waldrop's error. *Id.* **at 560**. Elan Inc. knew that Waldrop intended to sue it—the other party to Waldrop's contract—rather than Elan Corp. *Id.*

Unlike *Krupski* and *Elan Motorsports*, here, there is no indication that Jackson County was not named as a defendant in the original complaint due to a misunderstanding regarding the proper identity of a defendant. Rather, Plaintiff Mann simply did not bring a *Monell* claim against Jackson County, or anyone else, and there is nothing to indicate that Plaintiff intended to bring such a claim in his original complaint. Whatever Plaintiff's reason for not originally suing Jackson County for unconstitutional policies and/or procedures, simply put, nothing in the record before the Court indicates that it was due to a mistake of identity. Therefore, there is nothing to suggest that Jackson County should have known, within the period of time provided in Rule 4(m), that it should have been named as a defendant but for Plaintiff's mistake concerning the proper party's identity. *See also **Hodge v. Parker**,* **338 Fed.Appx. 534 (7th Cir. 2009) (where inmate amended complaint to add new defendants, amended complaint did not relate back to original complaint where addition of new defendants was not the result of mistakenly suing the wrong party initially)**. Plaintiff's Amended Complaint, therefore, does not relate back to his original complaint under Rule 15(c).

Since Plaintiff's Amended Complaint does not relate back, his claims against Jackson County were brought past the expiration of Illinois' two year statute of

limitations, and his claims against Jackson County are barred.[4]  Defendant Jackson County's Motion to Dismiss (Doc. 118) is therefore **GRANTED**, and all claims against Jackson County are **DISMISSED with prejudice**

MOTIONS FOR SUMMARY JUDGMENT

### 1. Summary Judgment Standard

The Court now turns to the two Motions for Summary Judgment: one filed by Defendants Fred, Gibbs, and Bludworth (Doc. 125), and the other filed by Defendant Gladson (Doc. 115).  Rule 56 of the Federal Rules of Civil Procedure governs summary judgment motions.  The rule states that summary judgment is appropriate only if the admissible evidence considered as a whole shows there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law.  *Archdiocese of Milwaukee v. Doe*, **743 F.3d 1101, 1105 (7th Cir. 2014) (citing** Fed.R.Civ.P. 56(a)).  The party seeking summary judgment bears the initial burden of demonstrating – based on the pleadings, affidavits and/or information obtained via discovery – the lack of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, **477 U.S. 317, 323 (1986)**.  A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, **477 U.S. 242, 248 (1986)**. *Accord Bunn v. Khoury Enterp. Inc.*, **753 F.3d 676 (7th Cir. 2014)**.

In assessing a summary judgment motion, the district court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving

---

[4] Even if Plaintiff's medical claims constituted an ongoing violation that lasted until his transfer out of the Jail, those claims are still barred by the Statute of Limitations.  Plaintiff left the Jail in August 2013, and the Amended Complaint was filed in September 2016.

party. *Anderson v. Donahoe*, **699 F.3d 989, 994 (7th Cir. 2012)**; *Righi v. SMC Corp.* , **632 F.3d 404, 408 (7th Cir. 2011)**; *Delapaz v. Richardson*, **634 F.3d 895, 899 (7th Cir. 2011)**. As the Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving [him] the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in [his] favor." *Spaine v. Community Contacts, Inc.*, **756 F.3d 542 (7th Cir. 2014)**.

### 2. Failure to Protect

Since Plaintiff's claims arise from a time when he was a pretrial detainee, his claims arise from the Due Process Clause of the Fourteenth Amendment. *See Budd v. Motley*, **711 F.3d 840, 842 (7th Cir. 2013)**. Though his claims come from the Fourteenth Amendment, the Eighth Amendment can be used as a "guide in evaluating his claims." *Id.* Although, under the Eighth Amendment, prison officials are required to protect inmates from one another, not every injury caused by another inmate translates into constitutional liability for prison officials responsible for the victim's safety. *Farmer v. Brennan*, **511 U.S. 825, 833-34 (1994)**; *Zarnes v. Rhodes*, **64 F.3d 285, 289 (7th Cir. 1995)**. To recover on a failure to protect claim, an inmate must demonstrate that prison officials were "deliberately indifferent" to a sufficiently serious risk of harm to the inmate. *Mathis v. Fairman*, **120 F.3d 88, 91 (7th Cir. 1997)**; *Zarnes*, **64 F.3d at 290**. A claim that a prison official was deliberately indifferent to such a risk has both an objective component and a subjective component. *Farmer*, **511 U.S. at 834**. The objective component is that the inmate must demonstrate that "he is incarcerated under

conditions posing a substantial risk of serious harm." *Farmer* **511 U.S. at 834**. To satisfy this objective prong, a plaintiff must allege not only that he or she experienced, or was exposed to, a serious harm, but also that there was a substantial risk beforehand that serious harm might actually occur. *Brown v. Budz*, **398 F.3d 904, 910 (7th Cir. 2005).** Courts have found that an inmate who has been assaulted has experienced a substantially serious harm. *Id.*

The subjective component is that the inmate must demonstrate prison officials are "deliberately indifferent" to the risk of harm, and such "deliberate indifference" constitutes a state of mind more blameworthy than mere negligence. *Farmer***, 511 U.S. at 834**. To be held liable for deliberate indifference, a prison official

> must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.

*Id.* **at 837**. In other words, to be deliberately indifferent, a prison official must have actual knowledge of a substantial risk that an inmate would be exposed to attacks and threats on his life by prisoners, but disregarded that risk by intentionally refusing or failing to take reasonable measures to deal with the problem**.** *Sowewimo v. Hennrich***, 81 F. App'x 893, 894 (7th Cir. 2003);** *See also Billman v. Ind. Dep't of Corr.***, 56 F.3d 785, 788 (7th Cir.1995) (stating that prison employees acted with deliberate indifference to an inmate's safety if the prison employees are aware of a serious threat and do nothing);** *Davis v. Carter***, 452 F.3d 686, 696 (7th Cir. 2006) ("Deliberate indifference requires that a prison official subjectively know of and disregard a substantial risk of harm.")**. Mere negligence or even gross negligence is not enough to state a claim of

deliberate indifference under the Eighth Amendment. *Daniels v. Williams*, **474 U.S. 327, 332 (1986);** *Sowewimo v. Hennrich*, **81 F. App'x 893, 894–95 (7th Cir. 2003)**. Moreover, prison employees acted with deliberate indifference to an inmate's safety only if the exposure was done "gratuitously." *Riccardo v. Rausch*, **375 F.3d 521, 525 (7th Cir. 2004) ("The qualification 'gratuitously' is important, because prisons are dangerous places. Inmates get there by violent acts, and many prisoners have a propensity to commit more.")**.

Plaintiff cannot recover against Defendants Fred and Gibbs on his failure to protect claim under Count 2 as there is not sufficient evidence to indicate that they were aware of the risk of harm posed by Inmate White.[5]  Plaintiff admits that, prior to the attack, he never complained about Inmate White to Defendants Fred and Gibbs.  In fact, he admits that he never had any problems with White prior to January 23, 2013.  While White was the source of prior violent incidents, the Court does not see how a reasonable juror could infer that Fred and Gibbs had knowledge of those incidents.  The Court is aware of, at most, three possible violent incidents involving Inmate White that occurred prior to January 23, 2013.  Defendants Fred and Gibbs are not mentioned in any of the reports regarding those incidents.  To ask a jury to infer knowledge of White's violent tendencies onto Fred and Gibbs, based on the record presented to the Court, would be to ask the jury to speculate.[6]  As such, summary judgment is appropriate as to Count 2 as against Defendants Fred and Gibbs.

---

[5] Count 2 is not levied against Defendant Gladson.  (*See* Doc. 6, p. 8; Doc. 110, p. 12).

[6] In one of his responses, Plaintiff referenced other violent incidents involving Inmate White that occurred after the January 23 attack.  Since those incidents occurred after the attack at issue, they are not relevant to the question of the defendants' state of mind prior to the attack and were therefore not considered.

The Court cannot find that summary judgment is appropriate as to Defendant Bludworth, however. Deliberate indifference can arise when prison officials place detainees together while knowing that at least one of the detainees has violent tendencies. *Brown v. Budz*, **398 F.3d 904, 914 – 15 (7th Cir. 2005)**. Defendant Bludworth clearly had notice of one of Inmate White's previous attacks, as she signed off on a disciplinary hearing report relating to one of them. The report indicates that White was the aggressor of the attack, that he beat another inmate and tried to drag this inmate up a stairwell and out of sight from the windows where the guards look-in. Due to the nature of this attack, a jury could reasonably find that Defendant Bludworth had notice of Inmate White's violent tendencies.

Even though Plaintiff never had any problems with, or raised any complaints regarding, Inmate White prior to the attack, a jury could still find that Defendant Bludworth was aware of a serious risk of harm posed to Plaintiff by White. It does not matter "whether a prisoner faces an excessive risk of attack for reasons personal to him or because all prisoners in his situation face such a risk." *Farmer*, **511 U.S. at 843**. Therefore, Defendant Bludworth's knowledge of Inmate White's violent tendencies constituted a knowledge of a substantial risk of harm to all inmates in C-Dorm, including Plaintiff, when White was placed there.

Defendant Bludworth has not demonstrated that she did not disregard the risk of harm to Plaintiff posed by Inmate White. Other than arguing that she did not have subjective knowledge, the only other argument raised by Bludworth is that it was not deliberately indifferent to place Plaintiff and White both in C-Dorm. If a prison official

placed Inmate White in a dorm setting while taking no precautions while knowing of White's violent tendencies, and with the Jail also having cell blocks, a jury could reasonably find that the prison official was deliberately indifferent to the danger posed by White. As Bludworth has raised no other arguments, the Court finds that summary judgment is not appropriate as to Defendant Bludworth.

### 3. Deliberate Indifference to Serious Medical Needs

Prison officials violate the Eighth Amendment's proscription against "cruel and unusual punishments" if they display deliberate indifference to an inmate's serious medical needs. *Greeno v. Daley*, **414 F.3d 645, 652–53 (7th Cir. 2005) (quoting** *Estelle v. Gamble*, **429 U.S. 97, 104 (1976) (internal quotation marks omitted)).** *Accord Rodriguez v. Plymouth Ambulance Serv.*, **577 F.3d 816, 828 (7th Cir. 2009) ("Deliberate indifference to serious medical needs of a prisoner constitutes the unnecessary and wanton infliction of pain forbidden by the Constitution.")**. A prisoner is entitled to reasonable measures to meet a substantial risk of serious harm — not to demand specific care. *Holloway v. Delaware Cnty. Sheriff*, **700 F.3d 1063, 1074 (7th Cir. 2012) (stating that a prison doctor "is free to make his own, independent medical determination as to the necessity of certain treatments or medications, so long as the determination is based on the physician's professional judgment and does not go against accepted professional standards");** *Forbes v. Edgar*, **112 F.3d 262, 267 (7th Cir. 1997).** Although a prison official may not continue a course of treatment he knows is blatantly ineffective, prisoners are not entitled to receive unqualified access to healthcare. *See Holloway*, **700 F.3d at 1073-74**. A doctor may provide the care he feels

is reasonable so long as it falls within a "range of acceptable courses based on prevailing standards in the field." *Id.* **at 1073**.

To prevail, a prisoner who brings an Eighth Amendment challenge of constitutionally-deficient medical care must satisfy a two-part test. *Arnett v. Webster*, **658 F.3d 742, 750 (7th Cir. 2011).** The first prong is whether the prisoner has shown he has an objectively serious medical need. *Arnett*, **658 F.3d at 750.** *Accord Greeno*, **414 F.3d at 653.** A medical condition need not be life-threatening to be serious; rather, it could be a condition that would result in further significant injury or unnecessary and wanton infliction of pain if not treated. *Gayton v. McCoy*, **593 F.3d 610, 620 (7th Cir. 2010).** *Accord Farmer v. Brennan*, **511 U.S. 825, 828 (1994) (violating the** *Eighth Amendment* **requires "deliberate indifference to a** *substantial* **risk of** *serious* **harm.")** **(internal quotation marks omitted) (emphasis added).** Only if the objective prong is satisfied is it necessary to analyze the second, subjective prong, which focuses on whether a defendant's state of mind was sufficiently culpable. *Greeno*, **414 F.3d at 652-53**.

Prevailing on the subjective prong requires a prisoner to show that a prison official has subjective knowledge of—and then disregards—an excessive risk to inmate health. *Greeno*, **414 F.3d at 653.** The plaintiff need not show the defendant literally ignored his complaint, just that the defendant was aware of the serious medical condition and either knowingly or recklessly disregarded it. *Hayes v. Snyder*, **546 F.3d 516, 524 (7th Cir. 2008).** Deliberate indifference is not negligence; rather it is more akin to intentional wrongdoing. *McGee v. Adams*, **721 F.3d 474, 480 (7th Cir. 2013).** The

standard is criminal recklessness, and even gross negligence will not meet this standard. *Id.* **at 481**.

Aside from Defendant Bludworth, the remaining defendants have failed to demonstrate that they are entitled to summary judgment on Plaintiff's claims for failure to provide medical care. The Court has no issue finding that the injuries suffered by Plaintiff—injured nose, injured ankle, bruises, and stab wounds—constituted a serious medical need. Viewing the facts in Plaintiff's favor, Defendants Fred and Gibbs both witnessed Plaintiff's injuries and did nothing about them. In fact, Defendant Fred commented that it looked like Plaintiff had been badly beaten; however, there is no indication in the record to suggest that Fred did anything to assist Plaintiff. If Plaintiff's allegations as to his injuries and as to the conduct of Fred and Gibbs are accurate, then Defendants Fred and Gibbs were clearly deliberately indifferent to Plaintiff's serious medical needs.

The claims against Defendant Gladson also survive summary judgment. Nurse Gladson admits to receiving the February 14 grievance wherein Plaintiff requested the discontinuation of Benadryl; however, she conveniently testified that she did not read the portion of the grievance wherein Plaintiff references a broken nose. In assessing Defendant Gladson's credibility, a jury could reasonably disbelieve Nurse Gladson and find that she read the entire grievance and was therefore placed on notice of Plaintiff's claim of a broken nose. With such notice, and by doing nothing to assist Plaintiff, Defendant Gladson would be deliberately indifferent to Plaintiff's injured nose.

The parties also dispute as to whether Plaintiff submitted the daily grievances

and medical requests.  With testimony from both Plaintiff and Inmate Bible, a jury could reasonably find that Plaintiff did submit such requests, and with Defendant Gladson admittedly receiving the February 14 grievance, a jury could also infer that Nurse Gladson received the other grievances/requests as well—particularly when the nursing staff reviews medical requests twice a day.  Defendant Gladson would be deliberately indifferent in ignoring these requests.

Finally, to the extent that Plaintiff raises claims relating to medical care against Defendant Bludworth, she is entitled to summary judgment.  There is no evidence in the record to suggest that Defendant Bludworth received and/or reviewed any grievances or medical requests, or was otherwise made aware of Plaintiff's injuries. Without any evidence of subjective knowledge on Defendant Bludworth's part, Plaintiff cannot recover against her for deliberate indifference.

## CONCLUSION

Finally, the Court notes that Plaintiff appears to attempt to revive Count 3 as against Defendant Bludworth for failing to respond to his grievances.  (Doc. 110, p. 11). That Count was dismissed with prejudice by Judge Reagan, however, as part of his initial threshold review.  (*See* Doc. 6, p. 8).  Going forward, there is no claim for failure to respond to Plaintiff's grievances.

For the reasons indicated above, Defendant Kupferer's Motion for Summary Judgment (Doc. 114) is **MOOT**; Defendant Jackson County's Motion to Dismiss (Doc. 118) is **GRANTED**; the Motion for Summary Judgment filed by Defendants Gibbs, Fred, and Bludworth (Doc. 125) is **GRANTED in part and DENIED in part**; and

Defendant Gladson's Motion for Summary Judgment (Doc. 115) is **DENIED**.  Therefore, the Court's disposition of the aforementioned motions results in the following:

- Defendant Jackson County is **DISMISSED with prejudice**;

- Count 2 is **DISMISSED with prejudice** as to Defendants Fred and Gibbs;

- Count 2 shall go forward as to Defendant Bludworth;

- Count 4 is **DISMISSED with prejudice** as to Defendant Bludworth;

- Count 4 shall go forward as to Defendants Fred, Gibbs, and Gladson.

The Clerk of Court shall enter judgment accordingly at the close of the case.  This matter is set for a Status Conference on **September 28, 2017** for the purpose of selecting dates for a Final Pretrial Conference and for trial.

　　　　**IT IS SO ORDERED**.
　　　　DATED: 9/19/2017

　　　　　　　　　　　　　　　　　　　　_/s/ Stephen C. Williams_
　　　　　　　　　　　　　　　　　　　　STEPHEN C. WILLIAMS
　　　　　　　　　　　　　　　　　　　　United States Magistrate Judge